UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

| | |
|---|---|
| BAYPOINTE MARINA ASSOCIATION, INC., <br><br> Plaintiff, <br><br> v. <br><br> 500 WILSON ST. LLC, in personam, CLINTON E. BROWN, in personam, and M/V FRONTIN, in rem, <br><br> Defendants. | CIVIL ACTION <br> NO. 3:24-00240-WGY-MCR |

YOUNG, D.J.[1]                                    June 25, 2026

**FINDINGS OF FACT, RULINGS OF LAW, AND ORDER FOR JUDGMENT**

St. Augustine, Florida, (in the District where this Court is privileged to sit by designation) and Boston, Massachusetts (where this Court physically sits in its admiralty courtroom, fittingly overlooking Boston Harbor) share a rich history as vital ports that for centuries have shaped the development of this Nation. See, e.g., HENRY H. ADAMS ET AL., SEA POWER: A NAVAL HISTORY 67, 253-54 (E.B. Potter & Chester W. Nimitz eds., 1960); SAMUEL ELIOT MORISON, THE MARITIME HISTORY OF MASSACHUSETTS, 1783-1860 passim (1961); WILLIAM A. BAKER, A HISTORY OF THE BOSTON MARINE SOCIETY 1742-1967 passim (1968).

---

[1] Of the District of Massachusetts, sitting by designation.

This Court and the parties (and witnesses) in this action, all share a deep connection, respect and admiration for the Sea. Indeed, all concerned here are brought together in this action -- together reaching out for justice -- to resolve whether a vessel owner and captain were negligent in the preparation for a hurricane of a larger pleasure yacht which dragged its mooring causing an allision[2] with a marina dock.  After careful consideration of the record, this Court finds and rules that the vessel owner and its captain were negligent, and therefore awards $75,000 in damages, jointly and severally, to the plaintiff.

## I. INTRODUCTION

The Plaintiff, Baypointe Marina Association, Inc. ("Baypointe"), brought this action against the Defendants, 500 Wilson St. LLC in personam ("500 Wilson St."), Clinton E. Brown ("Brown") in personam, and M/V Frontin in rem ("the Frontin") (collectively, "the Defendants"), claiming that the Frontin caused an allision with Baypointe's dock due to the negligence of its owners Wilson LLC and Brown.  See Compl., ECF No. 2. After a two-day, non-jury trial, the Court took the matter under

---

[2] "An allision occurs when a moving vessel strikes a stationary object such as a dock.  A collision occurs when a moving vessel strikes another moving vessel." Fischer v. S/Y NERAIDA, 508 F.3d 586, 589 n.1 (11th Cir. 2007).

advisement.[3]   Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, the Court provides its findings of fact, rulings of law, and order for judgment in favor of Baypointe and against the Defendants in the amount of $75,000, jointly and severally.

## II.   FINDINGS OF FACT

### A.   Hurricane Ian

Florida is, unfortunately, well-acquainted with hurricanes. The Court takes Judicial Notice that Hurricane Ian hit Florida in September 2022 pursuant to Fed. R. Evid. 201, and blanketing the St. Augustine area.   See Lisa Bucci et al., National Hurricane Center Tropical Cyclone Report: Hurricane Ian (March 12, 2026).[4]   Hurricane Ian made landfall in Southwest Florida as a Category 4[5] intensity hurricane and was the most expensive natural disaster in Florida history.   Id. at 1.

---

[3]   This case exemplifies the wisdom of the reflection necessary to write out the findings and rulings.   Here, although the Court expressed its tentative findings and ruling immediately following the parties' closings, this written reflection leads the Court to a conclusion that varies from its initial impression.   Its two course corrections are detailed below.

[4] See Association for Disabled Americans, Inc. v. Publix Super Markets, Inc., No. 98-CV-00917, 2023 WL 3741102, at *13, n. 9 (S.D. Fla. May 3, 2023), report and recommendation adopted, No. 98-00917-CIV, 2023 WL 3737799 (S.D. Fla. May 31, 2023) (taking judicial notice of when Hurricane Ian made landfall based upon NOAA information).

[5]   Hurricane Categories are based upon the Saffir-Simpson Hurricane Wind Scale.   See News-Press v. U.S. Dep't of Homeland Sec., 489 F.3d 1173, 1183 n.7 (11th Cir. 2007).

[3]

**B.    Brown Acquires the _Frontin_ in 2016 and Launches Her in 2022.**

Brown is a licensed captain and has owned several boats. In 2016, Brown, apparently through his entity 500 Wilson St., acquired the _Frontin_, a 73.8 foot pleasure vessel whose keel was laid in 1991.  See Certificate of Documentation, Ex. 4; USCG PSIX Vessel Search Results, Ex. 9.  The _Frontin_ is an impressive vessel:



Ex. 11 at 00:06.

From 2016 through 2022, the _Frontin_ was in drydock, while Brown refurbished the vessel, doing most of the work himself.

In or around June 2022, Brown launched the then-refurbished _Frontin_, initially docking her at Windward Marina, a boatyard located on the San Sebastian River near the Intracoastal Waterway and St Augustine.  Although Brown is neither a marine

[4]

mechanic nor diesel mechanic, he considers himself handy.  He performed in-water engine tests, and the like, to his satisfaction and obtained local advice from a mechanic at the marina concerning the seaworthiness of the Frontin.

In June 2022, Brown rented a mooring at the St. Augustine Municipal Marina and procured special insurance.  See St. Augustine Municipal Marina User Agreement ("User Agreement"), Ex. 13.

With respect to the rented mooring, Section 18(A) of the User Agreement provides:

> Marina moorings are not rated for wind-speed or hurricane categories . . . . During major storms or hurricanes, the City can not assure that the moorings will hold in high wind conditions.  Therefore, the Licensee must assume all liability from failure of the mooring during storm conditions.

User Agreement §18(A).

Brown took pride in the Frontin, spending almost every weekend on board the vessel from June 2022 through the date of the allision.

On June 18, 2022, Brown fueled the Frontin and ran it up and down the Matanzas River before returning to the mooring field.  The Frontin was at that point operational.

C.    **Hurricane Ian Approaches, St. Augustine Municipal Marina instructs Brown to Remove the Frontin**

A few days before Hurricane Ian hit, the St. Augustine Municipal Marina Yachtmaster contacted Brown personally to let

[5]

him know he needed to move the Frontin from the Municipal
Marina.  Brown told the Yachtmaster that he was going to remove
the Frontin from the mooring on September 25 or September 27.
Cell phone records reveal two calls between Brown and St.
Augustine Municipal Marina at 9:28 a.m. and 9:36 a.m. on
September 26, 2022.  See Ex. 22, Cellphone Records, at A8.[6]

### D.     Before the Allision -- Brown Attempts to Have the Frontin Towed after Engine Trouble

A series of calls were described at trial detailing Brown's
efforts to move the Frontin.  Neither party made clear the
temporal order of these calls, which is immaterial to the
Court's analysis.  It suffices for the Court to conclude only
that the following calls all occurred prior to the shutdown of
St. Augustine Marina on September 28, 2026.  Prior to the
shutdown of St. Augustine Municipal Marina, Brown contacted
Windward Marine, another local marina with hurricane storage,
asking to bring the Frontin there.  Windward Marina told Brown
that they were extremely busy but they would try to send
employees to assess the Frontin at the St. Augustine Municipal
Marina before nightfall.  The Windward Marina employees did not
assess the Frontin.

_____

[6] The Court observes that the parties' recollection of the
precise dates and times of contact are inconsistent.  The Court
finds that such inconsistencies are immaterial.  The Court
credits the witnesses' recollection that telephone calls were
made on or around the time as recollected.

[6]

Brown boarded the vessel in the early afternoon. He checked the mooring lines. He noted the current was shifting and it was a slack tide. Brown ensured the mooring lines were secured. He checked the bilge areas and switches. Up top, he removed soft items, such as a bimini top, cushions, life jackets, and a kayak.

Brown then attempted to start the engines. The port[7] side engine would "crank" but not start. The starboard[8] side engine started. The starboard engine was drawing cooling water, but not pumping it out of the engine, which could damage the engine. (Brown proffered[9] no evidence whether it was possible to maneuver the Frontin with one engine, whether running the engine without coolant water was dangerous, or the ultimate status of the

_____

[7] "Port" is the left side of a vessel when facing its front or "bow."

[8] "Starboard" is the right side of a vessel when facing its bow.

[9] Variously referred to as the Louisiana Rule or the Louisiana Presumption, this rule is not a true common law presumption at all. Instead, the Louisiana Rule shifts to the party against whom it applies not merely the burden of going forward to proffer evidence rebutting the presumption, but actually shifts the burden of persuasion to that party to **prove** the rebuttal by a fair preponderance of the evidence. See Bunge Corp. v. Freeport Marine Repair, Inc., 240 F.3d 919, 923 (11th Cir. 2001). This is akin to the "presumption" of validity in patent law which once the Patent Office has issued a patent, shifts to the party attacking patent validity the full burden of providing the patent invalid, indeed by clear and convincing evidence. See Microsoft Corp. v. i4i Ltd. P'ship., 564 U.S. 91, 95 (2011); Marcala, LLC v. RVLock & Co., LLC, No. 8:24-CV-1479-SDM-AAS, 2024 WL 3252891, at *2 (M.D. Fla. July 1, 2024) (Merryday, J.). This makes a significant difference here.

engine was when he went ashore.)  According to Brown, the "last thing [he] wanted to do was call for help."  Brown shut everything off and battened everything down.  By this time, it was mid-afternoon.

The Yachtmaster recalls that he contacted Brown the day prior to the storm to check on the status of the Frontin, and Brown told the Yachtmaster that the vessel was not operable and that he was trying to contact a towing service to remove to a safer location.  See also Ex. 22, Cell Records, at A9 (September 27, 2022, 6:36 p.m. call from Brown to St. Augustine Marina 904-825-1026).

**E.  Sea Tow Captain Advises Brown That He Could Not Tow Him and That the Frontin Should Stay on the Mooring**

Brown called Sea Tow, a boat towing service, and gave them all of his information.  A Sea Tow captain called him and asked about the situation.  Brown told Sea Tow that he was not in any danger, but that the St. Augustine Municipal Marina wanted him off the mooring.  The Sea Tow captain arrived and boarded the vessel later that day.  The Sea Tow captain told Brown that he didn't think they could move the boat as they were really busy, but that since Brown was on the mooring, he was in the safest place he could be and that "everyone" was insured.

Brown recalls that he told the Sea Tow captain that he was planning on staying with the Frontin through the storm, to which

the Sea Tow captain told him he was "crazy," and advised Brown not to stay on the Frontin because no one would come to assist him during the hurricane.

Brown stayed on the yacht until 11:00 p.m. and ultimately took the Sea Tow captain's advice.  Brown stayed at a local hotel with his wife the night of September 27, 2022.  See Ex. 7.

At 11:00 p.m., NOAA was tracking Hurricane Ian as follows:



See https://www.nhc.noaa.gov/archive/2022/IAN_graphics.php ("NOAA Graphics").

[9]

**F.    One Day Before the Allision -- Brown Re-Checked His Storm Preparation on the <u>Frontin</u> and Unsuccessfully Attempted to Start Both Engines**

The following morning, Wednesday, September 28, 2026, observing that the winds were not that bad, Brown returned to the vessel.  No one was at the Municipal Marina, so he had to dinghy[10] himself out to the <u>Frontin</u>'s mooring.  Brown checked everything again, and tried to start the engines.  Brown testified that he called SS Marine, a boat towing company, and told them that he could not get the <u>Frontin</u> running.[11]  SS Marine could not tow him.  They told him not to stay with the vessel.  Brown's wife also implored him to leave the <u>Frontin</u>.  Brown left the vessel.

By 11:00 a.m., NOAA was tracking Hurricane Ian, with a hurricane warning for Saint Augustine, as follows:

---

[10] A dinghy is a small boat used to ferry persons, typically between the vessels and the shore.

[11] There is a gap in the telephone records from September 27, 2022, 6:37 p.m. to September 29, 2022, 12:00 p.m.  The Court inquired whether the missing page was intended, and the Defendants confirmed to the Deputy Clerk that the exhibit was complete without the missing page.

[10]



**Surface Wind Field of Hurricane Ian**
Sustained Winds as of 1100 AM EDT Wed Sep 28, 2022    Advisory Number 24

<u>See</u> NOAA Graphics.

Brown testified that he felt he had done everything he could, and returned to the hotel to stay close. Brown admits that the Windward Marina was safer than the mooring. Brown also admits that he never called a diesel mechanic to try and fix the <u>Frontin's</u> engines because he thought he could handle it by himself.

G.    **The <u>Frontin</u> is Swept from the St. Augustine Municipal Marina and Allides with the Baypointe dock**

On Thursday, September 29, 2022, Hurricane Ian struck St. Augustine, Florida, by this time downgrading to a tropical storm. NOAA tracking:

[11]



See NOAA Graphics.

The storm uprooted the mooring tackle's helix from the seabed and drove the Frontin southeast, dragging her entire mooring tackle. Proceeding southeast with the storm surge up the Matanzas River, the encumbered Frontin entangled with another vessel, until it overran two pilings and allided with Baypointe's East-West floating dock at its marina. The other vessel became disentangled and proceeded further south prior to the allision. The videos in evidence capture the events leading up to and through the allision. See Exs. 17, 18, 19, 20 and 21.

[12]

The Court heard testimony from a charter captain who owns two slips at the Baypointe Marina. He witnessed and took the video of the _Frontin_'s allision. The charter captain also testified as to the condition of the dock both before and after the allision. The Court credits his testimony.



See Ex. 18, IMG 1101 at 00:04 (depicting the _Frontin_ drifting southward toward the dock).



Id. at 00:17 (depicting the Frontin striking the first pylon).



Id. at 00:25 (depicting the Frontin striking the second pylon).

[14]



_Id._ at 00:30 (depicting the Frontin striking the Baypointe dock).



Ex. 19 (depicting the Frontin pinned against the Baypointe dock with mooring tackle attached).

After the allision, as the tide went out, the Frontin ran aground in the mud a few feet from the dock. No one was injured.

On Friday, September 30, 2022, Brown became aware that the Frontin had drifted from its mooring location to the Baypointe Marina dock. On Saturday, October 1, 2022, Brown visited the Frontin. The boat was towed from the dock area on Sunday, October 2, 2022.

**H.   The Baypointe Marina Dock Is Damaged**

The Baypointe Marina consists of a fixed finger pier, which allows access via a wooden gangway to a floating dock. The dock consisted of an array of Bellingham floats that rise and fall with the tide, secured in place by stationary pilings. The pier juts out perpendicular to the shore and the floating dock runs East-West with shoreward floats spaced along to which individual slip pontoons are affixed.

The Court finds that the allision of the Frontin damaged the two offshore pilings, the wooden gangway and two East-West floats of the Baypointe Marina dock.

The Court has reviewed the repair and replacement proposals, see Exs. 1, 2, and 5. Baypointe replaced the entire dock at significant expense, as the dock was aging and it made

[16]

economic sense to replace it.  Baypointe stipulated at trial that the most it is seeking for damage attributable to the Frontin is $112,000; the lower of the two repair proposals.

Baypointe is not entitled to a new dock.  It is not limited, as the Defendants' would have it, however, to the value of the dock if it had been sold as is.  Rather, Baypointe is entitled to damages to bring the dock to its working state at the time of the allision.

The Court heard expert testimony that the sale value of that portion of the damaged Bellingham float and supporting pilings was approximately $4,800, and valued the repair, including labor, to replace the one section of the dock to be approximately $28,000.

While the Court generally credits this testimony, it finds that two floats showed damage following the allision and the testimony did not appear to account for the damage to the two offshore pilings or the metal attachments holding the wooden gangway in place.  Moreover, the expert was from Southern Florida (Miami), where he enjoyed significant economies of scale.  Baypointe appropriately sought estimates from contractors who were close at hand in the smaller market of St. Augustine and could promptly do the necessary restorative work. Accordingly, the Court values the reasonable repair to the docking system due to the allision at $75,000.

[17]

## III. RULINGS OF LAW

### A. Admiralty Jurisdiction

This Court rules that this negligence action is brought under this Court's exclusive Admiralty jurisdiction because the allision occurred on a navigable waterway. See Aqua Log, Inc. v. Lost and Abandoned Pre-Cut Logs and Rafts of Logs, 709 F.3d 1055, 1058 (11th Cir. 2013) (citing 28 U.S.C. § 1333(1)); Dolphin Cove Inn, Inc. v. Vessel Olympic Javelin, No. 3:19-CV-1018-J-34JRK, 2020 WL 8461570, at *4 (M.D. Fla. Dec. 22, 2020) (Klindt, U.S.M.J.) (ruling the Matanzas River a part of the intercoastal waterway navigable waterway and subject to admiralty jurisdiction), report and recommendation adopted sub nom. Dolphin Cove Inn, Inc. v. Vessel Olympic Javelin, No. 3:19-CV-1018-J-34JRK, 2021 WL 118871 (M.D. Fla. Jan. 13, 2021) (Howard, J.).[12]

---

[12] The federal court's admiralty jurisdiction stretches back to America's colonial roots, and is symbolized by the Silver Oar, a small replica of which is on display on the bench of this Court. One of the remaining two silver admiralty oars in the United States is with the Boston Museum of Fine Arts, the other with the Southern District of New York. See Federal Courts and the Silver Oar, https://exhibits.nhd.uscourts.gov/30.htm (describing the history of the Silver Oar).

[18]

**B.    The Defendants were Negligent in Preparation of the <u>Frontin</u>**

### 1. The <u>Louisiana</u> Rule in Admiralty Applies

Under the so-called <u>Louisiana</u> Rule, "[w]hen a moving ship strikes and damages a stationary object, it is presumed that the moving ship is at fault." <u>Bunge Corp.</u>, 240 F.3d at 923 (citing <u>The Louisiana</u>, 70 (3 Wall.) U.S. 164, 173 (1866)); <u>see also</u> <u>Crowley</u> v. <u>Costa</u>, 924 F. Supp. 2d 402, 414 (D. Conn. 2013) ("A moored vessel that breaks away from its moorings is presumed to be at fault" (citation omitted)).[13]  This rebuttable presumption "operates to shift the burden of persuasion onto the moving ship." <u>Bunge Corp.</u>, 240 F.3d at 923 (citing <u>Delta Transload, Inc.</u> v. <u>MV Navios Commander</u>, 818 F.2d 445, 449 (5th Cir. 1987)). The presumption is based upon "the common-sense observation that moving vessels do not usually collide with stationary objects unless the moving vessel is mishandled in some way," and further, "that 'any evidence of actual negligence, or the lack of it, is likely to be known only to the persons on board, who are in the best position to either keep damaging evidence hidden, or bring favorable evidence forward.'" <u>Id.</u> (quoting

---

[13]  Contrary to the Defendants' argument, Florida Statute § 327.59, which prevents marinas from requiring removal of vessels following the issuance of hurricane watches or warnings, does not apply to the parties here, and the <u>Louisiana</u> Rule applies. <u>See</u> <u>Stuart Cay Marina</u> v. <u>M/V Special Delivery</u>, 510 F. Supp. 2d 1063, 1071 (S.D. Fla. 2007) (applying <u>Louisiana</u> Rule where marina and vessel owner were not in privity of contract).

United States v. Merchant Mariner's License No. 008075 (Joseph J. O'Connell), Decision of the Vice-Commandant No. 2465, p. 8 (1981)).

The rebuttable presumption is "strong," and "places a "heavy burden" on the moving ship to overcome. Id. (citation omitted). The Eleventh Circuit holds, however, that proposition "simply mean[s] that the Louisiana Rule['s] presumption against the defendant is 'strong' in the sense of imposing a burden of persuasion upon the defendant, and not just a burden of production or of going forward." Fischer, 508 F.3d at 595 (footnote omitted).

### 2. The Louisiana Rule is Unrebutted on This Record

As the Eleventh Circuit holds, the Louisiana Rule's presumption is rebuttable through "any one of three ways: [1] that the allision was the fault of the stationary object[;] [2] that the moving vessel acted with reasonable care[;] or [3] that the allision was an unavoidable accident." Fischer, 508 F.3d at 593 (quoting Bunge Corp., 240 F.3d at 923). As the Eleventh Circuit explains, these three avenues are analogized to "contributory negligence, denial of negligence, and superceding causation, respectively," any of which "if sustained, is sufficient to defeat liability." Id. As there is neither argument, nor evidence that the allision was the fault of the

[20]

dock, the Court turns to the alternative arguments, neither of which prevail.

### a.    Reasonable Care (Denial of Negligence) Defense Unproven

In the specific context of a vessel that is loosed from its mooring, "[i]f the vessel owner is found to have acted reasonably in preparing for a storm, he will not be held liable even if the vessel eventually caused damage to other property." In re Skanska USA Civ. S.E. Inc., 577 F. Supp. 3d 1302, 1314 (N.D. Fla. 2021), aff'd sub nom., Skanska USA Civ. Se. Inc. v. Bagelheads, Inc., 75 F.4th 1290 (11th Cir. 2023) (quoting Fischer, 508 F.3d at 593). "Applied to the context of hurricane preparations, reasonable care amounts to whether the owner 'use[d] all reasonable means and took proper action to guard against, prevent or mitigate the dangers posed by the hurricane.'" Fischer, 508 F.3d at 594 (quoting Stuart Cay Marina v. M/V Special Delivery, 510 F. Supp. 2d 1063, 1072 (S.D. Fla. 2007)). Notably, "[a]lthough what 'reasonable care' requires changes with the circumstances, that standard recognizes the existence in every case of something more that could be done — and perhaps would be legally required under a 'highest degree of caution' standard — but that reasonable care does not demand." Id.

[21]

In fact, "[r]easonable care during maritime activity is measured in the context of 'prudent men familiar with the ways and vagaries of the sea.'" In re Skanska USA Civ. S.E. Inc., 577 F. Supp. 3d at 1314 (quoting Fischer, 508 F.3d at 593). While "the 'highest degree of caution' is not required to meet the standard, the vessel owner must take all reasonable measures under the circumstances." Id. (quoting Fischer, 508 F.3d at 594).

Here, it is proven that the Frontin was a drifting vessel that allided with the Baypointe Dock.[14]

As an initial matter, the Court fully credits that Brown subjectively believed that he did everything he reasonably could have done to prepare for the storm. The Court does not doubt Brown's sincerity and heartbreak; however, Brown is a licensed captain of a vessel which implies objective duties.

Brown knew, or should have known, that the mooring tackle to which his vessel was attached was neither wind rated, nor hurricane rated, as acknowledged in the mooring contract. See User Agreement, Ex. 13. Even if Brown was actually unaware of the moorings' capacities, it was not reasonable to stay on the

---

[14] The Court rejects the proposition that because the Frontin was connected to the mooring and its tackle it was somehow not drifting. The Defendants cite to no case law, binding or persuasive, supporting this proposition. The testimonial and video evidence demonstrates that vessel was drifting.

[22]

mooring given that there was an alternative.  See Paragon Asset Co. Ltd. v. Gulf Copper & Mfg. Corp., 622 F. Supp. 3d 360, 399-400 (S.D. Tex. 2022), aff'd sub nom. Paragon Asset Co., Ltd. v. American S.S. Owners Mut. Prot. and Indem. Ass'n, Inc., 99 F.4th 736 (5th Cir. 2024) ("Absent an accurate understanding of the mooring system actually in place, a vessel owner has no basis on which to conclude whether its mooring system can withstand an incoming storm.  In essence, a shipmaster without an accurate understanding of its own mooring system leaves the results to chance . . . [and falls] short of fulfilling its duties under maritime law."); Crowley, 924 F. Supp. 2d at 416 ("The forecast on Wednesday through Friday called for a severe storm, one which would call for a reasonably prudent boat owner to take his boat off of its moorings so as to prevent damage.").  In fact, it was Brown's initial plan to move the Frontin to a safer location.

Brown knew that one engine would not start and another started but would not expel water.  Brown did not attempt to use the one operating engine because, although he is not a mechanic, he was afraid of damaging the engine.  He also testified the last thing he wanted was to ask for help.  At that point, Brown was faced with four options: getting the Frontin towed, getting the Frontin assessed and repaired, running the single engine, or staying put on the mooring.

[23]

Brown attempted to get the Frontin towed, but that option was ultimately not available, at least with the companies Brown called. Brown testified that the towing captain who boarded the Frontin two days before the allision advised Brown that the Frontin was in the safest place on the mooring and, among other things, everyone was insured. Brown accepted this advice. This was poor advice. The St. Augustine Municipal Marina's mooring ground is not a sheltered harbor. To the Northeast -- from which a hurricane's counterclockwise winds might foreseeably be expected to come at some point because of the Coriolis Effect[15] -- is open water leading in from the Atlantic Ocean via the Saint Augustine Inlet to the Mantanzas River.[16]

---

[15] "Hurricanes typically get their spin from the Coriolis effect, which is a result of the rotation of Earth. In the Northern Hemisphere, the Coriolis effect is positive and causes winds to curve counter- clockwise. In the Southern Hemisphere, it is negative and makes winds curve clockwise." CALIFORNIA INST. TECH., Breaking the Typhoon Rules (April 29, 2003) https://www.jpl.nasa.gov/news/breaking-the-typhoon-rules/; see also NATIONAL ENVIRONMENTAL SATELLITE, DATA, AND INFORMATION SERVICE, What Is the Coriolis Effect? (Aug. 26, 2025) https://www.nesdis.noaa.gov/about/k-12-education/atmosphere/what-the-coriolis-effect.

[16] Had Brown's failure to take further reasonable action, occurred in any part, because he believed that he and anyone -- literally and figuratively downstream -- was insured does not meet the reasonableness standard. Indeed, Brown's understanding that he was insured and others' property was insured, does nothing to abrogate his responsibility to others' safety and property.

In the automobile context, another court has written:

[24]

As for the option of bringing on a mechanic to assess and repair the impaired engines, the evidence reveals that Brown had time to contact a professional mechanic to assess and, if necessary, attempt to repair the engine. Brown did not do so. Brown is self-sufficient, but he is not a mechanic. No reason was given at trial as to why he did not even attempt to have someone come onboard to assess the engines and at least attempt to repair the engines if necessary. There is no evidence, other than the engines' (eventually both) failure to start, as to the operational conditions of the engines at any point after that final attempt.

Brown undertook many reasonable and appropriate preparations as to the vessel on the mooring, and those actions are commendable. He did not, however, (1) try to maneuver to a safer location by running and potentially damaging the one

---

While insurance has unquestionable benefits, it also creates its own set of problems. The most important and troublesome of which is moral hazard — the idea that having insurance creates an incentive for a policyholder to change his or her behavior because someone else bears the potential loss . . . . a situation where having insurance causes the insured to relax the level of care he takes in safeguarding his property. He knows the insurer will bear the loss, and so he considers it a waste of time, money, and effort to take much care in securing the insured property.

Pittman v. State Farm Fire and Cas. Co., 868 F. Supp. 2d 1335, 1344-45 (M.D. Ala. 2012), aff'd, 519 Fed. Appx. 656 (11th Cir. 2013) (footnote omitted).

[25]

working engine when he was able to start it; or (2) secure a mechanic to assess and/or repair the engines.  Brown's failure to timely pursue either of these avenues are each an independently sufficient basis to rule that Brown has not met his burden to rebut the presumption of negligence.  Otherwise, Brown did everything he could in preparation for the hurricane and he wisely did not stay with the <u>Frontin</u>.

        **b.    Superceding Causation (Act of God) Defense is Unproven**

"The act of God defense denies that the defendant's acts or omissions, even assuming they did not meet the standard of reasonable care under the circumstances, caused the accident." <u>Fischer</u> v. <u>S/Y NERAIDA</u>, 508 F.3d 586, 596 (11th Cir. 2007) (citation omitted).  "This defense sensibly requires a showing that **all** reasonable measures would have been futile."  <u>Id.</u> (emphasis added).  The record in this case cannot sustain this burden when there were reasonable measures available that, if successful, would have made the allision impossible.  This defense has not been proven.

**C.    Damages**

"Although the <u>Louisiana</u> rule 'creates a presumption of negligent operation, it does not create an additional presumption that the allision caused whatever damages are alleged.'"  <u>Crowley</u>, 924 F. Supp. 2d at 417 (quotation omitted).

[26]

On the one-hand, Baypointe is not entitled to an entire new dock, and on the other is not limited, as the Defendants' would have it, to the value of the dock had it been sold as is. Rather, Baypointe is entitled to damages to bring the dock to its working state at the time of the allision. See In re Marquette Transp. Co., LLC, 292 F. Supp. 3d 719, 730 (E.D. La. 2018) ("Physical damage to shore structures and to fixed objects such as the dock in question is compensable.  Where the damage is reparable, there is liability for reasonable repairs." (citation omitted)).  Based upon its findings of fact above, including the nature of the damages and weighing the testimony of the witnesses and expert witness, see supra, Part II.H, the Court values the reasonable repair to the docking system due to the allision at $75,000.

## IV.    ORDER FOR JUDGMENT

Brown's privilege of owning and being a skipper of a large pleasure craft comes with it concomitant responsibility for the safety of others and their property.  Here, while Brown did much, the Court finds and rules that the Defendants failed to meet their burden under the Louisiana Rule to rebut the presumption of negligence when the Frontin allided with Baypointe's dock.  The Court further found damages as a result of the allision.  Based upon its findings and rulings above, judgment shall enter in of favor Baypointe in the amount of

[27]

$75,000 against the Defendants, jointly and severally, on the single count for negligence.

**SO ORDERED.**

WILLIAM G. YOUNG
JUDGE
of the
UNITED STATES[17]

---

[17] This is how my predecessor, Peleg Sprague (D. Mass 1841-1865), would sign official documents. Now that I'm a Senior District Judge I adopt this format in honor of all the judicial colleagues, state and federal, with whom I have had the privilege to serve over the past 48 years.

[28]